UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, N.A., | ) | 2:11-CV-01364-PMP-RJJ |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MERITAGE HOMES CORPORATION | ) | ORDER |
| and MERITAGE HOMES OF NEVADA, | ) | |
| INC., | ) | |
| | ) | |
| Defendants/Counterclaimants. | ) | |
| _____ | ) | |

Presently before the Court is Plaintiff JPMorgan Chase Bank, N.A.'s ("JPMorgan") Motion for Summary Judgment (Doc. #14), filed on September 14, 2011. Defendants Meritage Homes Corporation and Meritage Homes of Nevada, Inc. (collectively, "Meritage") filed an Opposition and Cross-Motion for Summary Judgment (Doc. #39) on October 26, 2011. JPMorgan filed a Reply and Opposition to Meritage's Cross-Motion (Doc. #43) on November 21, 2011. Meritage filed a Reply on its Cross-Motion (Doc. #53) on December 9, 2011.

Also before the Court is Meritage's Motion for Relief Pursuant to Rule 56(d) (Doc. #40), filed on October 26, 2011. JPMorgan filed an Opposition (Doc. #43) on November 21, 2011. Meritage filed a Reply (Doc. #52) on December 9, 2011.

Also before the Court is Meritage's Motion for Leave to File Sur-Reply or Alternatively to Strike (Doc. #51), filed on December 9, 2011. JPMorgan filed an Opposition (Doc. #61) on December 23, 2011. Meritage filed a Reply (Doc. #64) on January 3, 2012.

Also before the Court is JPMorgan's Motion for Substitution of Parties Pursuant to Federal Rule of Civil Procedure 25(c) (Doc. #54), filed on December 12, 2011.  Meritage filed an Opposition (Doc. #63) on December 29, 2011.  JPMorgan filed a Reply (Doc. #70) on January 13, 2012.

The parties filed various supplemental briefs in relation to the above motions. (Doc. #77, #78, #80.)  The Court held a hearing on these motions on February 14, 2012. (Mins. of Proceedings (Doc. #73).)

**I. BACKGROUND**

South Edge, LLC ("South Edge") is a limited liability company that owns a real estate development known as Inspirada.  (Opp'n to Mot. Summ. J. & Cross Mot. Summ. J. (Doc. #39), Decl. of Larry Seay ["Seay Decl."] at 2.)  South Edge was formed by eight builders who are South Edge's members:  KB Home Nevada, Inc.; Coleman-Toll Limited Partnership; Pardee Homes of Nevada; Beazer Homes Holdings Corp.; Meritage; Focus South Group, LLC; Alameda Investments, LLC; and Kimball Hill Homes.  (Id.)

To fund the Inspirada project, South Edge took out loans in the aggregate amount of $585 million pursuant to a Credit Agreement under which JPMorgan acts as Agent for a consortium of lenders.  (Id. at 2-3.)  As security for the loans, JPMorgan and the other lenders obtained liens on virtually all of South Edge's real and personal property.  (Id.) Additionally, each South Edge member and its respective parent signed guaranties in favor of JPMorgan as Agent under the Credit Agreement, including the Repayment Guaranty at issue in this case.  (Mot. Summ. J. (Doc. #14), Decl. of James E. Hough ["Hough Decl."], Ex. A.)  Generally, the Repayment Guaranty provides that Meritage will pay its portion of the purchase price for the land, along with interest and other fees and payments, in the event that South Edge experiences a "Bankruptcy Event" as defined in the Repayment Guaranty. (Id.)

///

2

Through various interrelated agreements, the parties structured loan repayment to be satisfied in two ways.  First, South Edge's members entered into Acquisition Agreements with South Edge pursuant to which members would "takedown" a section of the property, meaning the member would purchase a portion of the land, thereby gradually transferring the property from South Edge to the members.  (Seay Decl. at 3 & Ex. 6.)  South Edge was to use the takedown money received from the member to make payment to JPMorgan.  (Id. at 4 & Ex. 3.)  In return, JPMorgan would release its lien on the parcel of property taken down by the member.  (Id. at 4 & Ex. 3.)  Second, South Edge was to make periodic interest payments to JPMorgan.  (Id. at 4 & Ex. 3.)  To make these payments, South Edge made capital calls on its members.  (Id. at 4.)

Pursuant to the takedown schedule, Meritage had two takedowns, one in April 2007 and one in April 2008.  (Id. at 3 & Ex. 6.)  Meritage performed its April 2007 takedown.  (Id. at 7.)  However, by late 2007, two of South Edge's members indicated they might not be able to perform under the various agreements related to South Edge and Inspirada.  (Id. at 5.)  In February 2008, South Edge's members held a vote on a capital call to fund an interest payment.  (Id. at 6 & Exs. 12-14.)  Meritage voted in favor of funding the interest payment, but all of the other members except one either voted against it or declined to vote.  (Id. at 6 & Ex. 14.)  As a result, South Edge did not receive capital call funds, did not make the interest payment to JPMorgan, and thereby triggered an Event of Default under the Credit Agreement.  (Id. at 6 & Ex. 14.)  On March 10, 2008, JPMorgan issued a formal notice of default to South Edge.  (Id. at 6 & Ex. 15.)

Meritage's second takedown was scheduled for April 2008.  (Id. at 7 & Ex. 6.)  On April 15, 2008, Meritage wired over $16 million to the escrow agent for its second takedown.  (Id. at 7 & Ex. 16.)  Meritage also contacted JPMorgan to confirm JPMorgan would release its liens on the property.  (Id. at 7 & Ex. 17.)  JPMorgan's Managing Director indicated "he did not believe there would be any issue" with Meritage executing its

takedown, but he "was going to check with his legal department and get back to [Meritage] with a formal response." (Id., Ex. 17.)  JPMorgan subsequently refused to release its liens on the property because South Edge was in Material Default under the Credit Agreement. (Id. at 7 & Ex. 18.)  Meritage thus did not complete its April 2008 takedown.  (Id. at 7.)

JPMorgan, South Edge, the members, and their respective parents thereafter entered into a Forbearance Agreement.  (Id. at 8 & Ex. 19.)  Under the Forbearance Agreement, the parties essentially agreed that JPMorgan would allow South Edge more time to address the financial problems of two of its members rather than pursue remedies based on South Edge's default.  (Id. at 8 & Ex. 19.)  The Forbearance Agreement expired at the end of June 2008 without any cure of existing defaults.  (Id., Ex. 20.)

In November 2008, counsel for JPMorgan suggested that if Meritage still wanted to perform its final takedown, that it contact JPMorgan and request a waiver of the condition in the Credit Agreement that there be no Material Default at the time of a takedown.  (Id., Ex. 18.)  There is no evidence Meritage made any such request.  In October 2009, JPMorgan suggested to all members that if they wished to perform individual takedowns, JPMorgan would allow them to do so despite the defaults and would release its liens on the property, so long as the member paid the full purchase price and the major infrastructure deposit.  (Id., Ex. 20.)  There is no evidence that any of the members performed a takedown in response to this offer.

On December 9, 2009, JPMorgan initiated an involuntary bankruptcy petition against South Edge and moved for the appointment of a bankruptcy trustee.  (In re South Edge, LLC, Case No. 10-32968-BAM; Opp'n to Mot. Summ. J. & Cross Mot. Summ. J., Decl. of Douglas Northrup ["Northrup Decl."], Ex. 12.)  The bankruptcy court granted the motion, and the Office of the United States Trustee designated Cynthia Nelson (the "Trustee") to serve as South Edge's trustee.  (Northrup Decl., Ex. 14.)

///

4

After an unsuccessful appeal to this Court of the order appointing the Trustee, JPMorgan entered into a Plan Support Agreement with KB Home Nevada, Inc.; Coleman-Toll Limited Partnership; Pardee Homes of Nevada; and Beazer Homes Holdings Corp. (the "Settling Builders"). Pursuant to the Plan Support Agreement, JPMorgan and the Settling Builders agreed to become joint proponents of a proposed plan of reorganization which would settle various lawsuits among the interested parties as well as provide for an exit from bankruptcy. Meritage did not join the Plan Support Agreement. (Northrup Decl., Ex. 5 at 14.)

On June 6, 2011, JPMorgan, as Agent, made demand on Meritage to pay on the Repayment Guaranty, contending South Edge's involuntary bankruptcy proceeding was a "Bankruptcy Event" that triggered the Repayment Guaranty. (Mot. Summ. J., Decl. of William A. Austin ["Austin Decl."], Ex. B.) On June 20, 2011, Meritage responded, indicating that it would not pay the Repayment Guaranty. (Hough Decl., Ex. C.) JPMorgan brought this action on August 23, 2011, asserting a single count for breach of the Repayment Guaranty. (Compl. (Doc. #1).) Meritage filed an Answer and Counterclaim, asserting counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory judgment. (Ans. & Countercl. (Doc. #22).)

Thereafter, JPMorgan and the Settling Builders filed the Joint Plan of Reorganization Proposed by JPMorgan Chase Bank, N.A., as Administrative Agent Under the Prepetition Credit Agreement, and the Settling Builders (the "Plan") in the South Edge bankruptcy proceeding. (In re South Edge, LLC, 2:11-CV-01963-PMP-PAL, Order (Doc. #40) at 3.) Every secured and unsecured creditor who returned a ballot supported the Plan, as did seven of South Edge's eight members. (Id.) Only Meritage filed objections to the Plan and the proposed confirmation order. (Id.) After holding a hearing on Meritage's objections at which various witnesses testified, the bankruptcy court overruled the objections and confirmed the Plan. (Id.)

The Plan generally provides for the Settling Builders to contribute approximately $330 million to pay administrative expenses, secured claims, and general unsecured claims against the estate, and to fund various expenses related to future development of Inspirada. (Id.)  In exchange, the prepetition lenders agreed to release the Settling Builders for amounts owed under the Credit Agreement and various guaranties by the Settling Builders and their parents, despite the fact that this would leave a deficiency of approximately $47 million owed to the prepetition lenders under the Credit Agreement.  (Id. at 4.)  Under the Plan, South Edge's assets are transferred to an Acquirer, a new entity formed by the Settling Builders called Inspirada Builders, LLC.  (Id.)

The Plan contains a provision through which the Settling Builders, rather than the prepetition lenders, assumed the risk of collecting on Meritage's Repayment Guaranty. Pursuant to section 3.4(f) of the Plan, the Settling Builders contributed over $12 million to be placed in an escrow account.  (Id.)  The amount deposited had to be "equal to the amount of the Meritage Repayment Guaranty liability as of the Effective Date."  (Id.)  Thereafter,

> [a]ny Prepetition Lender . . . may elect . . . . to assign to the Settling Builders a participation in the assigning Prepetition Lender's pro rata interest in the Meritage Repayment Guaranty claim under the Prepetition Credit Agreement, and in exchange for the assignment of such participation, the assigning Prepetition Lender's pro rata interest in the Meritage Repayment Guaranty Escrow shall be delivered to such Prepetition Lender on the Effective Date.  To the extent that any portion of the Meritage Repayment Guaranty Escrow is not paid to electing Prepetition Lenders, then such amount . . . shall be disbursed to the Acquirer.
>     By electing to assign a participation in the Meritage Repayment Guaranty claim, the electing Prepetition Lender agrees to direct (consistent with the instructions of the Settling Builders) a sub-Agent . . . to pursue and, if instructed by the Settling Builders, settle the litigation concerning the Meritage Repayment Guaranty claim, which litigation shall be funded and directed solely by the Settling Builders, and the electing Prepetition Lenders shall be relieved of any obligation, financial or otherwise, including indemnity or expense reimbursement, with respect to any such litigation.

(Id.)  In its Confirmation Order, the bankruptcy court ruled that the Plan's "treatment of the [prepetition lenders' secured] and [unsecured deficiency] Claims will not affect the

1  Meritage Parties' liability on their Repayment, Completion, and Limited Guaranties, which

2  are not being satisfied or released under the Plan." (Id. at 6-7.)

3        Meritage appealed the bankruptcy court's Confirmation Order to this Court and

4  this Court affirmed plan confirmation. (Id. at 23.) Specifically with respect to the treatment

5  of Meritage's Repayment Guaranty, the Court held the bankruptcy court properly resolved

6  the issue within its exclusive jurisdiction–the impact of Plan confirmation on Meritage's

7  Repayment Guaranty under bankruptcy law–and left for another forum to resolve the

8  impact, if any, of the Plan transactions on Meritage's Repayment Guaranty under applicable

9  state law. (Id. at 21-22.)

10        JPMorgan moves for summary judgment in this action, arguing no genuine issue

11  of material fact remains that Meritage agreed to the Repayment Guaranty's terms, a

12  Bankruptcy Event has occurred triggering the guaranty, and Meritage has refused to pay.

13  JPMorgan also contends Meritage waived any defenses under the Repayment Guaranty.

14        Meritage responds that JPMorgan lacks standing to enforce the Repayment

15  Guaranty because upon Plan confirmation in the bankruptcy proceeding, JPMorgan and the

16  other lenders were paid in full on Meritage's Repayment Guaranty, and JPMorgan thus no

17  longer has an individual stake in the litigation. Meritage thus cross-moves for summary

18  judgment on mootness and standing grounds. Meritage also asserts a variety of defenses,

19  including that its April 2008 tender satisfied its obligations under the Repayment Guaranty,

20  and that JPMorgan could not trigger the Repayment Guaranty by instituting an involuntary

21  bankruptcy proceeding against South Edge. Meritage argues it did not waive defenses

22  because any waiver would not apply to enforcing the Repayment Guaranty's terms and

23  because JPMorgan is misinterpreting the waiver provision. Finally, Meritage contends

24  JPMorgan failed to establish damages.

25        JPMorgan opposes the cross-motion, arguing the Plan does not eliminate

26  Meritage's obligations under the Repayment Guaranty. Rather, the Repayment Guaranty is

still owed to JPMorgan and the other lenders, JPMorgan retains the contractual right to pursue Meritage on the Repayment Guaranty, and lenders may opt to sell participation in any recovery to the Settling Builders. .  JPMorgan further contends Meritage waived all defenses, and even if it did not, Meritage's defenses fail because JPMorgan had the contractual right to refuse to release its lien on the property while South Edge was in default JPMorgan contractually could institute an involuntary bankruptcy proceeding, and it did so in good faith.  Finally, JPMorgan contends it established its damages.

Meritage also moves the Court to deny JPMorgan's Motion for Summary Judgment as premature.  According to Meritage, further discovery is needed on a variety of topics before summary adjudication would be proper.  JPMorgan responds that no genuine issue of material fact remains on the key issues in the case, and the discovery Meritage seeks relates only to extrinsic evidence which is irrelevant where the Repayment Guaranty is unambiguous.  JPMorgan also contends Meritage has had ample discovery in the other related actions, including the bankruptcy proceedings.

Finally, JPMorgan moves to substitute Development Specialists, Inc. as Plaintiff in this action, in conformity with the Plan's provision for appointment of a sub-Agent to pursue Meritage on the Repayment Guaranty.  JPMorgan would remain a party for purposes of defending against Meritage's counterclaims.  Meritage opposes, arguing substitution is inappropriate because JPMorgan lacks standing and substitution of DSI would not cure this defect.  Meritage further argues substitution is not proper because JPMorgan has not transferred an interest to DSI, and substituting DSI would not expedite the case.

## II.  LEGAL STANDARD

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  A fact is "material" if it might affect the outcome of a suit, as determined by the

governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all evidence in the light most favorable to the non-moving party.  Id.

## III.  MERITAGE'S CROSS-MOTION - MOOTNESS/STANDING

Both standing and mootness are jurisdictional issues deriving from the "case or controversy" requirement of Article III of the United States Constitution.  Cole v. Oroville Union High Sch. Dist., 228 F.3d 1092, 1098 (9th Cir. 2000).  Standing depends on "whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy, and serves to ensure that legal questions presented to the court will be resolved in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."  Hall v. Norton, 266 F.3d 969, 975 (9th Cir. 2001) (quotations, alterations, and internal citation omitted).  When evaluating standing, the court looks to the facts "as they exist at the time the complaint was filed."  Am. Civil Liberties Union of Nev. v. Lomax, 471 F.3d 1010, 1015 (9th Cir. 2006) (emphasis omitted).  Mootness, on the other hand, is the "doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."  Vasquez v. L.A. Cnty., 487 F.3d 1246, 1253 n.6 (9th Cir. 2007) (quotation omitted).  To establish standing under Article III of the Constitution, a plaintiff must show "(1) injury in fact; (2) causation; and (3) likelihood that the injury will be redressed by a favorable decision."  Lomax, 471 F.3d at 1015.

///

9

1    Where an indebtedness is satisfied, any guaranty of the same payment is likewise

2    satisfied.  Gill v. Waterhouse, 245 F. 75, 80 (9th Cir. 1917); Mathias v. Jacobs, 238 F.

3    Supp. 2d 556, 571-72 (S.D.N.Y. 2002).[1]  A debt obligation is extinguished if the lender

4    accepts a performance offered by a third person in satisfaction of the primary debtor's

5    obligation.  Restatement (Second) of Contracts § 278(2).

6    Here, Meritage contends that JPMorgan and the other lenders lack standing to

7    pursue this action because, according to Meritage, JPMorgan and the other lenders were

8    paid in full for Meritage's obligation under the Repayment Guaranty by the Settling

9    Builders in the bankruptcy proceeding.  Meritage argues that because JPMorgan was paid in

10   full, JPMorgan lacks standing to pursue the present action.

11   While theoretically the Settling Builders could have extinguished Meritage's

12   obligations under the Repayment Guaranty by paying JPMorgan and the other lenders in

13   full on Meritage's behalf, no genuine issue of fact remains that the debt owed to JPMorgan

14   and the other lenders was neither paid in full nor paid or accepted in satisfaction of

15   Meritage's obligations under the Repayment Guaranty.  JPMorgan negotiated with the

16   Settling Builders to settle claims amongst those parties for an amount which was

17   approximately $47 million less than what was owed on the overall debt.  (In re South Edge,

18   LLC, 2:11-CV-01963-PMP-PAL, Order (Doc. #40) at 4; Northrup Decl., Ex. 16 at 53.)

19   That is an amount well above the approximately $13 million JPMorgan contends Meritage

20   owes under its Repayment Guaranty.  (Austin Decl. at 3.)  Consequently, a deficiency

21   remains which exceeds the amount Meritage purportedly owes on its Repayment Guaranty,

22   and JPMorgan and the other lenders therefore were not paid in full.

23   ///

24

25

26   [1]  The Repayment Guaranty states that it is governed by New York law.  (Hough Decl., Ex. A at 6.)

1    Further, the Settling Builders did not pay, and JPMorgan did not accept, the

2    Settling Builders' payments in satisfaction of Meritage's obligations under the Repayment

3    Guaranty.  Because JPMorgan felt it had a strong position on the Repayment Guaranties

4    against all the parent companies, JPMorgan took the negotiating position with the Settling

5    Builders that it would not accept less than the principal amount owed under all of the

6    Repayment Guaranties, including Meritage's, regardless of whether Meritage participated in

7    the settlement.  (Northrup Decl., Ex. 5 at 10-11, Ex. 6 at 8-10, Ex. 16 at 53, Ex. 17 at 27,

8    69.)  JPMorgan and the Settling Builders thus used the Repayment Guaranties, including

9    Meritage's Repayment Guaranty, as a reference point to set the amount of the settlement's

10   cash component as between each other.  But the Settling Builders did not make the payment

11   to satisfy Meritage's obligations, nor did JPMorgan and the other lenders accept it as doing

12   so.  (Northrup Decl., Ex. 6 at 22-23.)  This is reflected in the Plan, which provides for the

13   Settling Builders to pay a certain dollar amount to settle their own claims with JPMorgan,

14   maintains Meritage's liability on the Repayment Guaranty, and provides a mechanism for

15   the lenders to sell to the Settling Builders participation in any recovery against Meritage

16   under the Repayment Guaranty.  The Repayment Guaranty specifically provides that the

17   lenders may sell such participation.  (Hough Decl., Ex. A at 6.)

18         Because the underlying indebtedness has not been satisfied, and because the

19   settling parties did not structure their settlement such that Meritage's obligations were

20   extinguished, JPMorgan does not lack standing in this action.  JPMorgan as Agent for the

21   benefit of the lenders continues to have the legal right to pursue Meritage on the Repayment

22   Guaranty.[2]  The Court therefore will deny Meritage's Cross-Motion for Summary

23   _____

24         [2]  In supplemental briefing, Meritage argues that an arbitration demand by the Acquirer,
     Inspirada Builders, LLC, is an attempt to collect on the same debt as the present lawsuit, and thus
25   demonstrates JPMorgan no longer has standing in this action.  The arbitration demand is by Inspirada
     Builders, LLC based on alleged breaches of the Operating Agreement for failure to make capital
26   contributions to South Edge.  (Defs.' Mot. for Leave to File Supplemental Briefing Re: Effect of

1  Judgment.

2  **IV.  JPMORGAN'S MOTION FOR SUMMARY JUDGMENT**

3      **A.  Waiver**

4      JPMorgan argues Meritage waived all defenses under the Repayment Guaranty

5  and the Forbearance Agreement.  Meritage responds that it cannot waive the terms of the

6  Repayment Guaranty itself, conditions precedent to the Repayment Guaranty being

7  triggered, or JPMorgan's post-execution conduct of the parties that interfered with or

8  prevented the conditions which would terminate Meritage's obligations under the

9  Repayment Guaranty.  Meritage also argues the waiver provision upon which JPMorgan

10 relies does not apply to Meritage.  Finally, Meritage contends it did not waive defenses

11 under the Forbearance Agreement.

12     To establish a prima facie case of nonpayment of a guaranty, the plaintiff must

13 show the underlying obligation, the unconditional guaranty, and "failure to make payments

14 called for by their terms."  Banner Indus., Inc. v. Key B.H. Assocs., L.P., 170 A.D.2d 246,

15 246 (N.Y.A.D. 1991); see also Bank Leumi Trust Co. of N.Y. v. Rattet & Liebman, 182

16 A.D.2d 541, 542 (N.Y.A.D. 1992).  Upon the plaintiff making this showing, the burden

17 shifts to the defendant to "come forward with proof showing the existence of a triable issue

18 of fact with respect to a bona fide defense."  Bank Leumi Trust Co., 182 A.D.2d at 542.

19     Under New York law, clear and unambiguous unconditional guarantees are

20 enforceable, and "[w]here a guaranty states that it is 'absolute and unconditional,'

21 guarantors are generally precluded from raising any affirmative defense."  HSH Nordbank

22 Ag N.Y. Branch v. Swerdlow, 672 F. Supp. 2d 409, 418 (S.D.N.Y. 2009); see, e.g., Hotel

23 71 Mezz Lender LLC v. Mitchell, 63 A.D.3d 447, 448 (N.Y.A.D. 2009) (holding express

24 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

25 Arbitration Demand (Doc. #75), Ex. 1.)  An arbitration demand by a different entity based on alleged
   violations of a separate agreement for a different contractual obligation do not demonstrate that
26 JPMorgan lacks standing to enforce the Repayment Guaranty in this action.

waiver in guaranty barred defenses); <u>N. Fork Bank v. Computerized Quality Separation Corp.</u>, 62 A.D.3d 973, 974 (N.Y.A.D. 2009) (dismissing counterclaims due to waiver in guaranty); <u>Red Tulip, LLC v. Neiva</u>, 44 A.D.3d 204, 206, 209-10 (N.Y.A.D. 2007) (holding "absolute and unconditional" guaranty which "absolutely, unconditionally and irrevocably" waived right to assert "any defense, set-off, counterclaim or cross claim of any nature whatsoever with respect to this guaranty," except the defense of actual payment, waived all counterclaims and defenses).  A "guarantor cannot assert defenses that it expressly waived in the guaranty agreement."  <u>Swerdlow</u>, 672 F. Supp. 2d at 418.  This includes waivers which give advance consent to the release of collateral or to modifications of related agreements.  <u>Id.</u> at 418-19.  However, a guarantor cannot waive the affirmative defenses of payment, lack of consideration for the guaranty, or fraud[3] as a matter of law.  <u>See</u> <u>CIT Group/Commercial Servs., Inc. v. Prisco</u>, 640 F. Supp. 2d 401, 410 (S.D.N.Y. 2009); <u>Nat'l Westminster Bank USA v. Ross</u>, 676 F. Supp. 48, 53-54 (S.D.N.Y. 1987).

"A guarantee agreement is to be construed like other contracts."  <u>95 Lorimer, LLC v. Ins. Co. of State of Penn.</u>, 789 N.Y.S.2d 833, 837 (N.Y. Sup. Ct. 2004) (quotation omitted).  In interpreting a guaranty, the Court seeks to determine the parties' intentions based upon the guaranty's language "in light of custom and practice in the industry."  <u>Flexi-Van Leasing, Inc. v. Isaias</u>, 23 F. Supp. 2d 419, 422 (S.D.N.Y. 1998).  The Court strictly construes the guaranty's terms in the guarantor's favor.  <u>Id.</u>

The Court begins with the contract's plain language.  <u>Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC</u>, 724 F. Supp. 2d 398, 403-04 (S.D.N.Y. 2010).  If the contract is "complete, clear and unambiguous on its face," the Court must enforce it "according to the plain meaning of its terms."  <u>Id.</u> (quotation omitted).  A contract is unambiguous if

---

[3] Under certain circumstances, a guarantor can waive the defense of fraud in the inducement.  <u>Citibank, N.A. v. Plapinger</u>, 485 N.E.2d 974, 976-77 (N.Y. 1985).

1    "reasonable persons could not differ as to its meaning." Id. at 404.

2    　　　If the contract is ambiguous, "its interpretation becomes a question of fact not
3    appropriately resolved on a motion for judgment on the pleadings or for dismissal." Id. A
4    contract is ambiguous if the language could "suggest more than one meaning when viewed
5    objectively by a reasonably intelligent person who has examined the context of the entire
6    integrated agreement and who is cognizant of the customs, practices, usages and
7    terminology as generally understood in the particular trade or business." Id. (quotation
8    omitted). A party may not rely on extrinsic evidence to create an ambiguity if the contract
9    is "complete and clear and unambiguous upon its face." Id. (quotation omitted). A
10   contract's language "is not ambiguous . . . simply because the parties urge different
11   interpretations, or if one party's view strains the contract language beyond its reasonable
12   and ordinary meaning." Id. (quotation and alteration omitted). The Court must read
13   together "all writings which form part of a single transaction and are designed to effectuate
14   the same purpose." TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 89 (2d Cir.
15   2005). Whether a contract is ambiguous is a question of law for the Court. Morgan Stanley
16   & Co. Int'l, 724 F. Supp. 2d at 404.

17   　　　In Section 3(e) of the Repayment Guaranty, Meritage agreed that its liability was
18   "absolute, irrevocable and unconditional irrespective of: . . . any other setoff, defense or
19   counterclaim whatsoever (in any case, whether based on contract, tort or any other theory)
20   with respect to the Facility Documents or the transactions contemplated thereby which
21   might constitute a legal or equitable defense available to, or discharge of, the Borrower or a
22   guarantor." (Hough Decl., Ex. A at 3, § 3(e).) "Guarantor" is defined as Meritage. (Id. at
23   1.) The "Facility Documents" are defined as the Credit Agreement, related letters of credit,
24   and "any writing evidencing, supporting or securing a Facility, including but not limited to
25   this Guaranty . . . ." (Id.)

26   ///

As an initial matter, the Court rejects Meritage's argument that the waiver in Section 3(e) does not apply to Meritage.  Meritage argues that because "Guarantor" with a capital "G" is a defined term referring to Meritage, and the waiver in Section 3(e) refers to "guarantor" with a small "g," Section 3(e) does not waive any defenses or counterclaims belonging to Meritage.

Reading the contract as a whole and in the context of the parties' intentions, Section 3(e)'s waiver applies to Meritage.  The word "guarantor" in Section 3(e) encompasses both Meritage and other guarantors, i.e., the other members of South Edge and their respective parent companies.  Where the parties intended to refer only to Meritage, they used the defined term "Guarantor."  Where the parties intended to exclude Meritage from the general category of "guarantor," they used the words "other guarantors."  (Id. at 2 § 2(a), 5 § 11.)  But where, as in this context, the parties intended to refer to Meritage and the other guarantors, they used the general term "a guarantor" without the word "other."  This reading is consistent with Section 18, by which Meritage "waives any right to interpose any counterclaim related to this Guaranty or the transactions contemplated hereby in any such action," and with the language that the Guaranty was "absolute, irrevocable and unconditional."  (Id. at 3 § 3, 6 § 18.)  It also is consistent with New York law that an absolute and unconditional guaranty waives affirmative defenses.[4]

However, Meritage cannot not waive payment as a defense as a matter of New York law.  Meritage therefore has not waived its argument that its obligations under the Repayment Guaranty were satisfied in April 2008, when Meritage tendered performance

---

[4] Meritage contends a genuine issue of fact remains as to whether Meritage intended to waive any all defenses.  Meritage does not point to any evidence in the record that Meritage did not understand by the Guaranty's plain language that it was waiving its defenses.

1    under the Acquisition Agreement.[5]

2         Additionally, two of the issues which Meritage raises are not affirmative

3    defenses; rather, they seek to undermine JPMorgan's prima facie case.  Meritage argues

4    JPMorgan could not trigger the Repayment Guaranty by initiating an involuntary

5    bankruptcy petition, and thus Meritage challenges whether JPMorgan has met its initial

6    burden of showing Meritage failed to make payment on the Repayment Guaranty according

7    to the Guaranty's terms.  Meritage also disputes the measure of damages, an issue which

8    New York has treated as different from an affirmative defense in this context.  See CIT

9    Group/Commercial Servs., 640 F. Supp. 2d at 407-10 (treating a guarantor's challenge to

10   the amount of damages differently from affirmative defenses by reviewing the challenge to

11   the measure of damages on the merits but holding the guarantor waived affirmative

12   defenses).

13        However, Meritage has waived its defense that the Repayment Guaranty and

14   JPMorgan's efforts to enforce it are unconscionable.  Meritage also waived its defense that

15   the Plan modifies the underlying contract and therefore releases Meritage from its

16   obligations under the Repayment Guaranty.  Neither of these defenses relates to payment,

17   lack of consideration for the Guaranty, fraud, or that JPMorgan failed to meet its initial

18   burden of establishing a prima facie case.

19        Both of these defenses fail on the merits even if Meritage had not waived them.

20   The Repayment Guaranty is not unconscionable as a matter of law, as Meritage cannot

21   show any procedural unconscionability nor such an overwhelming imbalance in the

22   contract's terms to support substantive unconscionability.  Simar Holding Corp. v. GSC, 87

23   _____

24        [5]  Likewise, Meritage has not waived its argument that its obligations under the Repayment
     Guaranty were satisfied by Plan confirmation in the bankruptcy proceedings.  However, the Court

25   already has ruled that Meritage's obligations were not satisfied through Plan confirmation.  The Court
     will address Meritage's argument that it owes nothing after Plan confirmation based on the calculation

26   set forth in the Repayment Guaranty when the Court discusses damages below.

A.D.3d 688, 689-90 (N.Y.A.D. 2011).  As to the modification of the underlying contract,

Meritage specifically waived–

> (a) any change in the time, manner or place of payment of, or in any other term of, all or any of the Facility Documents or Liabilities, or any other amendment or waiver of or any consent to departure from any of the terms of any Facility Document or Liabilities, including any increase or decrease in the rate of interest thereon; (b) any release or amendment or waiver of, or consent to departure from, any other guaranty or support document, or any exchange, release or non-perfection of any Collateral, for all or any of the Facility Documents or Liabilities; [and] (c) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Facility Document or Liabilities . . . .

(Hough Decl., Ex. A at 3.)  Meritage therefore waived in advance its current argument that

Meritage ought to be released as guarantor because the Plan altered the underlying

contracts.  See Port Distrib. Corp. v. Pflaumer, 880 F. Supp. 204, 211-12 (S.D.N.Y. 1995).

Meritage has not waived any of its defenses under the Forbearance Agreement.

By its terms, the Forbearance Agreement does not waive or release defenses.  (Seay Decl.,

Ex. 19 at 8-9.)

**B.  Payment - the April 2008 Tender**

Meritage argues that its tender in April 2008 of the full release price for its

takedown satisfied its obligations under Section 2(c) of the Repayment Guaranty.  Meritage

argues that JPMorgan's refusal to accept tender is irrelevant because if payment is tendered

and the lender refuses to accept it, the guarantor is discharged.  Meritage further argues that

JPMorgan breached Section 5(b) of the Assignment Agreement by refusing to release its

liens on the property, and Meritage's performance therefore is excused.  Meritage further

argues that its obligations are extinguished because JPMorgan improperly prevented the

occurrence of conditions which would have terminated Meritage's obligations under the

Repayment Guaranty by refusing to release its liens on the property even though Meritage

fully performed.  Finally, Meritage argues that even if JPMorgan had discretion under the

Assignment Agreement to refuse to release the liens, JPMorgan arbitrarily refused to do so, thereby breaching the implied covenant of good faith and fair dealing. Meritage contends this breach relieves it of liability under the Repayment Guaranty.

JPMorgan responds that Section 2(c) of the Repayment Guaranty requires that payment be made to JPMorgan, and Meritage never tendered payment to JPMorgan; rather the escrow instructions were to pay South Edge. JPMorgan thus argues Meritage attempted to satisfy its obligations under Section 2(b) of the Repayment Guaranty by performing its takedown. JPMorgan contends it did not breach any agreement in refusing to release its liens in response to Meritage's attempted takedown because the Assignment Agreement does not require JPMorgan to release its liens unless conditions for such a release are satisfied under the Credit Agreement's terms. According to JPMorgan, the Credit Agreement provides that a condition to release of the liens is that there is no Material Default, and it is undisputed that South Edge was in Material Default in April 2008. Finally, JPMorgan contends it did not breach the covenant of good faith and fair dealing by exercising its contractual rights, and that its decision not to release the liens was not arbitrary or in bad faith.

Under New York law, "[t]ender and refusal are equivalent to performance." Kortright v. Cady, 7 E.P. Smith 343, 1860 WL 7852, at *1 (N.Y. 1860); see also Restatement (Third) of Suretyship & Guaranty § 46. Consequently, where the obligation is to pay money, if the obligee refuses tender of payment by the primary obligor, both the underlying obligation and the secondary guaranty obligation are discharged as if satisfied by payment. Restatement (Third) of Suretyship & Guaranty § 46. However, tender of performance "must be in accordance with the terms of the contract." Sherba v. Midstate Precast Sys., Inc., 230 A.D.2d 944, 946 (N.Y.A.D. 1996) (quotation omitted); see also Restatement (Third) of Suretyship & Guaranty § 46 cmt. a. Likewise, where one party to a contract materially breaches the contract, "the non-breaching party is discharged from

performing any further obligations under the contract."  <u>NAS Elec., Inc. v. Transtech Elec.</u>
<u>PTE Ltd.</u>, 262 F. Supp. 2d 134, 145 (S.D.N.Y. 2003); <u>see also</u> <u>Merrill Lynch & Co. Inc. v.</u>
<u>Allegheny Energy, Inc.</u>, 500 F.3d 171, 186 (2d Cir. 2007).

  The Repayment Guaranty provides two methods for Meritage to satisfy its obligations.  First, under Section 2(b), the Repayment Guaranty would be satisfied upon Meritage completing all of its required takedowns.  Second, under Section 2(c), Meritage could extinguish its obligation under the Repayment Guaranty by paying its Guaranteed Share of all outstanding Liabilities to JPMorgan.

1.  Section 2(b)

  Section 2(b) provides that Meritage could extinguish its obligation under the Repayment Guaranty by acquiring all of the phases it agreed to purchase under its Acquisition Agreement, paying JPMorgan as Administrative Agent "the entire amount of the Release Price for all such Phases provided under the Credit Agreement," and paying "all sums (if any) required to be paid by the Member Guarantor under Section 7.03(b) of the Credit Agreement."  (Hough Decl., Ex. A at 2-3.)  Pursuant to Section 7.03(b)(v) of the Credit Agreement, upon satisfaction of certain payments and other conditions precedent to a takedown, "and provided no Material Default has occurred that is continuing, the Administrative Agent shall . . . execute and deliver a partial release or reconveyance of the applicable Phase at the time of the Takedown."  (Seay Decl., Ex. 3 at 73.)  A "Material Default" includes South Edge's failure to pay interest when due.  (<u>Id.</u> at 17, 79.)

  Under an Assignment Agreement, South Edge assigned to JPMorgan as Agent a security interest in South Edge's rights under the Acquisition Agreement.  (Seay Decl., Ex. 8.)  Section 5(b) of the Assignment Agreement provides:

> So long as there shall then exist no breach, default (except one that will be cured by the payment of the Takedown Price), or event of default on the part of any Member Party under any of its Guaranties . . ., and provided the conditions to the delivery of a partial release or reconveyance of the applicable Phase under the Credit Agreement are

19

satisfied, the Administrative Agent shall deliver a partial release or
reconveyance of such Phase from the Deed of Trust at the time of the
Takedown of such Phase by the applicable Member, provided that, if
an Event of Default has occurred and is continuing, the Borrower and
the applicable Member Parties shall have agreed (if so demanded by
the Administrative Agent) to pay, and shall pay, the entire proceeds of
such Takedown directly to, or as directed by, the Administrative Agent
. . . for application, first, to the Release Price and the balance to a Cash
Collateral Account as Collateral, first for the obligations of the
Member and its Parent Guarantor to pay Development Costs and,
second, for the Secured Obligations.

(Id. at 3.)

Meritage's Release Price for its April 2008 takedown was $12,343,500.  (Seay
Decl., Ex. 3, Sched. 2.)  In April 2008, Meritage wired over $16 million to the escrow agent
to complete its takedown.  (Seay Decl., Ex. 16.)  Per the escrow instructions, these funds
were to be distributed to the "Seller," South Edge.  (Id.)  In the estimated closing statement,
$12,343,500 is debited to the "Seller," which the closing statement identifies as South Edge,
for "Payoff to JPMorgan/Release Price/APX."  (Ex. 1 to Feb. 14, 2012 Hrg. (Doc. #74).)
The estimated closing statement also shows funds to be paid to South Edge for Meritage's
other obligations under the Credit Agreement, including major infrastructure deposits and
LID assessments.  (Id.)

Under the Assignment Agreement's language in Section 5(b), so long as
Meritage was not in default under its Guaranties, and so long as all conditions for the
release of liens under the Credit Agreement were satisfied, JPMorgan was required to
release its liens on the property upon Meritage's attempted takedown.  However, when
Meritage attempted its April 2008 takedown, not all conditions for release were satisfied
under the Credit Agreement because South Edge undisputably was in default for failure to
make an interest payment.

The parties dispute the meaning of the phrase following "provided that" in
Section 5(b) of the Assignment Agreement.  Meritage contends it means that even if an
Event of Default had occurred and was continuing, JPMorgan still was required to release

20

its liens on a takedown unless JPMorgan demanded that it be paid directly and South Edge and Meritage agreed to pay JPMorgan directly.  JPMorgan contends the disputed language means that if an Event of Default had occurred and was continuing, JPMorgan had no obligation to release its liens unless it demanded direct payment and Meritage in fact paid JPMorgan directly.

Reading the Credit Agreement and Assignment Agreement together, JPMorgan contractually was required to release its liens upon performance of a takedown where all preconditions for such a takedown were satisfied.  One of those conditions, however, was that South Edge not be in Material Default.  Once South Edge was in default, JPMorgan was not required to release its liens on the property.  The "provided that" language in the Assignment Agreement reflects South Edge and Meritage's agreement that if a continuing Event of Default existed, Meritage would pay JPMorgan the entire proceeds of the takedown directly if JPMorgan so demanded.  Absent JPMorgan's demand, however, the status quo under the agreements while an Event of Default continued was that JPMorgan was not required to release its liens because the preconditions for release were not satisfied under the Credit Agreement.  The "provided that" clause unambiguously sets forth JPMorgan's option to demand direct payment should there be a continuing Event of Default.

No genuine issue of material fact remains that Meritage's April 2008 tender therefore did not operate as a tender and refusal equal to performance because Meritage did not fully perform under the relevant agreements.  Under the Credit Agreement, South Edge's default precluded full performance by Meritage absent demand from JPMorgan for direct payment.  JPMorgan neither made such demand, nor, as discussed below, did Meritage tender direct payment to JPMorgan.  Meritage therefore did not satisfy its obligation under Section 2(b) of the Repayment Guaranty by its April 2008 tender.

///

2.  Section 2(c)

Section 2(c) provides that Meritage's obligation under the Repayment Guaranty could be satisfied "if, at any time after the Obligations shall be, or shall be declared, due and payable under the Credit Agreement (notwithstanding whether a Bankruptcy Event has occurred), the Guarantor shall pay to the Administrative Agent all Liabilities . . . ." (Hough Decl., Ex. A at 3.)  "Liabilities" include Meritage's Guaranteed Share of the principal, interest, and various fees and payments.  (Id. at 2.)  Meritage's "Guaranteed Share" is determined by means of a calculation which roughly equates to Meritage's percentage ownership in any property owned by South Edge that had not yet been taken down.  (Id.)

No genuine issue of material fact remains that Meritage did not satisfy its obligations under Section 2(c) because it never tendered payment to JPMorgan.  Per the escrow instructions, Meritage was attempting a takedown in accord with the parties' various agreements, which would have satisfied Meritage's obligations under Section 2(b) of the Repayment Guaranty had the takedown been completed.[6]  (Seay Decl., Ex. 16 at 1 ("This letter shall constitute the instructions of Meritage to [the escrow agent] in connection with the second Takedown . . . .").)  The escrow instructions direct the escrow agent to "[d]isburse funds to Seller."  (Id. at 4.)  "Seller" is identified as South Edge, not JPMorgan. (Seay Decl., Ex. 16 at 1 (identifying "Seller" as a party to the Acquisition Agreement), Ex. 6 (identifying South Edge as the counterparty to the Acquisition Agreement).)

That Meritage never attempted to pay JPMorgan directly is confirmed by the estimated closing statement, which identifies the "Seller" as South Edge, and debits "Seller" with the $12,343,500.  (Ex. 1 to Feb. 14, 2012 Hrg.)  Although this sum represented

---

[6]  Under a takedown, Meritage would acquire the property free and clear of all liens.  (Seay Decl., Ex. 3 at 73, 90, Ex. 16 at 2.)  In contrast, under Section 2(c) of the Repayment Guaranty, Meritage would not obtain the property free and clear of all liens.  Rather, Meritage would satisfy its guaranty obligation, and thereby be subrogated to JPMorgan's rights and priority.  (Hough Decl., Ex. A at 3-4); see Sachs v. Adeli, 16 A.D.3d 175, 178-79 (N.Y.A.D. 2005);

"Payoff to JPMorgan/Release Price/APX," it was to be paid to South Edge.  Moreover, under Section 2(c), Meritage would have to tender all Liabilities, not just the Release Price, to JPMorgan.  Consequently, even if the estimated closing statement could be read to state that the Release Price would be paid to JPMorgan directly, Meritage's payment of other obligations were being debited to South Edge, with no notation that any such funds would be paid to JPMorgan.  Meritage therefore did not tender performance to the proper party to satisfy its obligation under Section 2(c) of the Repayment Guaranty.

### 3.  Frustration of Performance/Good Faith and Fair Dealing

Meritage argues that its obligations under the Repayment Guaranty are excused because JPMorgan  prevented the occurrence of conditions which would have terminated Meritage's liability under the Repayment Guaranty by breaching the Assignment Agreement.  This argument fails because, as discussed above, JPMorgan did not breach the Assignment Agreement by refusing to release its liens on the property while an Event of Default continued.

Meritage further argues that JPMorgan breached the covenant of good faith and fair dealing because it was within JPMorgan's discretion to proceed with the takedown despite South Edge's default, and JPMorgan arbitrarily and in bad faith refused to do so.  JPMorgan responds that Meritage has waived the good faith and fair dealing defense.  Moreover, JPMorgan argues it did not act arbitrarily or in bad faith by exercising its contractual rights.

No genuine issue of material fact remains that Meritage waived its good faith and fair dealing defense.  New York law upholds absolute and unconditional waivers of defenses such as bad faith and frustration of performance.  Red Tulip, LLC, 44 A.D.3d at 212-13 (concluding that guarantor waived frustration of performance defense, although reaching that conclusion only after evaluating the defense on the merits); see also Swerdlow, 672 F. Supp. 2d at 419 n.13 (holding frustration of performance and bad faith

1   were affirmative defenses which guarantor waived under broad waiver provision in

2   guaranty); Hotel 71 Mezz Lender LLC, 63 A.D.3d at 448 (holding guaranty waived

3   defenses of frustration of performance, breach of the covenant of good faith and fair

4   dealing, and fraudulent inducement).

5          Meritage relies on Canterbury Realty and Equipment Corporation v.

6   Poughkeepsie Savings Bank, 135 A.D.2d 102 (N.Y.A.D. 1988) to argue it has not waived

7   this defense.  However, the Canterbury court concluded the guarantors there did not waive a

8   similar defense because nothing in the language of the guaranty at issue in that case

9   suggested the guarantors waived defenses related to enforcing the guaranty's terms.

10  Canterbury, 135 A.D. 2d at 106.  Here, in contrast, Meritage agreed to waive defenses

11  related not only to the underlying obligation, but also "with respect to the Facility

12  Documents or the transactions contemplated thereby . . . ."  (Hough Decl., Ex. A at 3, §

13  3(e).)  The Guaranty is identified as one of the "Facility Documents."  (Id. at 1.)

14         Even if Meritage did not waive this defense, it fails on the merits.  Meritage has

15  not presented any evidence raising a genuine issue of material fact that JPMorgan acted in

16  bad faith by refusing to waive the condition that South Edge not be in default.  Under New

17  York law, "[e]xercising contract rights to protect an investment does not constitute bad

18  faith."  Swerdlow, 672 F. Supp. 2d at 419-20 (quotation omitted); Red Tulip, LLC, 44

19  A.D.3d at 212 (holding "legitimate business decisions to protect [a] substantial investment"

20  did not amount to wrongful conduct).

21         The evidence shows JPMorgan refused to go forward with Meritage's April 2008

22  takedown because the payment may have provoked disputes within the lender group about

23  who was entitled to payment.  (Seay Decl. at 7, Northrup Decl., Ex. 18 at 113, 209-10.)

24  Additionally, JPMorgan believed the other members of South Edge were financially sound

25  and would cure the existing defaults.  (Northrup Decl., Ex. 18 at 13-14, 76, 78, 80, 170-71.)

26  Further, JPMorgan was in the process of negotiating the Forbearance Agreement with all

24

parties, which was aimed at giving South Edge and its members time to correct the defaults. (Seay Decl. at 8; Northrup Decl., Ex. 5 at 6, Ex. 18 at 170-71.)  JPMorgan "thought it would be best to have this all dealt with during that period," and decided that because of the default, JPMorgan did not have to release its liens and it "would leave this to be dealt with in the negotiations during the forbearance period" to get "a total solution."  (Northrup Decl., Ex. 18 at 210-11, 213, 230.)

There is nothing wrongful or unfair about JPMorgan exercising its contractual rights.  Nor was there anything arbitrary, irrational, or in bad faith in JPMorgan's reasons for not waiving a contractual provision.  Moreover, contrary to Meritage's characterization, JPMorgan did not misrepresent its willingness to proceed with the takedown despite the default.  JPMorgan's Managing Director initially indicated that JPMorgan might approve the takedown despite South Edge's default, but he stated he would have to consult with the legal department and get back to Meritage with a formal response.  JPMorgan thus did not indicate that it would proceed with the takedown and then suddenly change position. Meritage could have taken JPMorgan up on its November 2008 offer to request a waiver of the condition or its later offer that it would allow members to proceed with their takedowns despite South Edge's default.  Meritage did not do so.  Consequently, this case is not analogous to Canterbury, where the bank wrongfully and unfairly brought about the occurrence of the condition precedent to accelerate the loan against the guarantors by consenting to the primary obligor borrowing above the credit agreement's limits, but then refusing to honor checks and retaining any incoming funds on the primary obligor's receivables.  135 A.D.2d at 103-09.  No genuine issue of material fact remains that JPMorgan did not act in bad faith and was within its contractual rights to refuse to waive the default in April 2008.

///

///

4.  Involuntary Bankruptcy

Under the Repayment Guaranty, Meritage's liability is triggered by a

"Bankruptcy Event."  (Hough Decl., Ex. A at 2.)  A "Bankruptcy Event" means:

> that (i) an involuntary proceeding shall be commenced or an
> involuntary petition shall be filed against [South Edge] seeking
> liquidation, reorganization or other relief under any bankruptcy law
> now or hereafter in effect and such proceeding or petition shall
> continue undismissed for 60 days or an order or decree approving or
> ordering any of the foregoing shall be entered; or (ii) [South Edge]
> shall voluntarily commence any proceeding or file any petition seeking
> liquidation, reorganization or other relief under any bankruptcy law
> now or hereafter in effect.

(Id. at 1-2.)  The Repayment Guaranty contains an integration clause stating that the

Guaranty sets forth the parties' "entire understanding," constitutes "the entire contract," and

"supersedes any and all previous agreements and understandings, oral or written, relating to

the subject matter hereof."  (Hough Decl., Ex. A at 6-7.)

It is undisputed that an involuntary proceeding was filed against South Edge, that

it had been pending for sixty days, and that the bankruptcy court had ordered relief at the

time JPMorgan made demand on Meritage under the Repayment Guaranty.  The parties

dispute only whether JPMorgan could institute the involuntary bankruptcy proceedings

against South Edge to trigger Meritage's Repayment Guaranty.

Under New York law, an ambiguity in a contract "does not arise from silence, but

from 'what was written so blindly and imperfectly that its meaning is doubtful.'"  Nissho

Iwai Europe PLC v. Korea First Bank, 782 N.E.2d 55, 60 (N.Y. 2002) (quoting Trustees of

Freeholders & Commonalty of Town of Southampton v. Jessup, 65 N.E. 949, 951 (N.Y.

1903)).  The Court determines whether an ambiguity exists as a matter of law "from the

face of an agreement without regard to extrinsic evidence."  Reiss v. Fin. Performance

Corp., 764 N.E.2d 958, 961 (N.Y. 2001) (quotation omitted); see also Greenfield v. Philles

Records, Inc., 780 N.E.2d 166, 170-71 (N.Y. 2002).  The Court "may not by construction

add or excise terms, nor distort the meaning of those used and thereby make a new contract

26

for the parties under the guise of interpreting the writing." <u>Reiss</u>, 764 N.E.2d at 961 (quotation omitted).

For example, where a contract was silent as to the duration of employment, the agreement unambiguously was for at-will employment; the court would not imply a durational term. <u>Talansky v. Am. Jewish Historical Soc'y</u>, 779 N.Y.S.2d 58, 59 (N.Y.A.D. 2004). Likewise, where an agreement was silent as to whether one party had to give the other notice and an opportunity to cure, the contract unambiguously did not contain notice and cure provisions. <u>Fesseha v. TD Waterhouse Investor Servs., Inc.</u>, 747 N.Y.S.2d 676, 679 (N.Y. Sup. Ct. 2002); <u>see also</u> <u>Union Carbide Corp. v. Affiliated FM Ins. Co.</u>, 891 N.Y.S.2d 347, 350 (N.Y.A.D. 2009) (holding insurance contract was not ambiguous where it was silent on whether the limit of liability was annualized; the court could not "alter the plain terms of the contract by adding the word 'annual' where it simply does not otherwise exist" (quotation omitted)).

The Repayment Guaranty unambiguously defines a Bankruptcy Event. Meritage relies on extrinsic evidence to suggest an ambiguity, but the Court cannot refer to extrinsic evidence unless and until it has determined an ambiguity in the contract language exists. No such ambiguity exists here. Instead, Meritage seeks to have the Court add to the Repayment Guaranty a provision that a Bankruptcy Event cannot be triggered by JPMorgan, but that term does not exist in the contract. Had the parties intended to limit the meaning of a Bankruptcy Event, they could have done so, as reflected by the parties' use of different language in the Credit Agreement. (Seay Decl., Ex. 3 at JPMC004616, JPMC004621.) Meritage's liability under the Repayment Guaranty therefore was triggered when JPMorgan made demand in June 2011 because a Bankruptcy Event had occurred as defined by the Repayment Guaranty.

To the extent Meritage argues that filing the involuntary bankruptcy petition violated JPMorgan's duty of good faith and fair dealing, Meritage has waived this defense,

as discussed above.  But even if Meritage has not waived the defense, as with JPMorgan's decision to decline to release its liens, JPMorgan had the contractual right to initiate an involuntary bankruptcy proceeding against South Edge to protect JPMorgan's investment, and that does not amount to bad faith as a matter of law.  Moreover, the bankruptcy court ruled that JPMorgan did not file the petition nor propose the Plan in bad faith.  (In re South Edge, LLC, 2:11-CV-00240-PMP-RJJ, Notice of Appeal (Doc. #3), Ex. 3 at 41-45; Pls.' Reply in Support of Mot. Summ. J. (Doc. #43), Hough Decl., Ex. 7 at 16-17.)  No genuine issue of material fact remains that JPMorgan did not act in bad faith by filing the petition.

### 5.  Damages

Meritage argues that JPMorgan has failed to establish its damages because it provided no calculation and no documentary evidence in support.  Meritage further argues that damages are a fact question not suitable for determination on summary judgment.  Meritage also contends that upon Plan confirmation, JPMorgan had no damages because the Repayment Guaranty was paid in full, or alternatively, because when the calculation set forth in the Guaranty is performed, both the numerator and denominator are zero.  Finally, Meritage argues that because the transaction in the Plan is an asset sale, Meritage is liable only for its percentage of the deficiency if one exists.

JPMorgan responds that it adequately has shown damages through a sworn declaration.  JPMorgan further argues that Plan confirmation did not satisfy or reduce JPMorgan's damages, and, in any event the Repayment Guaranty provides that Meritage's obligations are not reduced by payments from any other guarantor nor extinguished by a restructuring of the underlying documents through bankruptcy.  JPMorgan contends this is the only logical result, as a guaranty triggered by bankruptcy such as the Repayment Guaranty would be worthless if discharge of the debt in bankruptcy extinguished the guarantor's liability as well.

///

The Court already has rejected Meritage's argument that JPMorgan has no

damages because the Repayment Guaranty was paid in full through Plan confirmation.  The

Court likewise rejects Meritage's contention that Meritage's liability is extinguished

because, upon Plan confirmation, the numerator and denominator in the Repayment

Guaranty's calculation of Meritage's Guaranteed Share is zero.  The Repayment Guaranty

defines "Guaranteed Share" as:

> at any time a fraction, stated as a percentage, having as its numerator
> the aggregate amount of the Release Prices of all Phases to be
> acquired, but not yet acquired, by the Member Guarantor under its
> Acquisition Agreement and as its denominator the aggregate amount of
> the Release Prices of all Phases of the Project to be acquired, but not
> yet acquired, by all Members who are not Released Guarantors
> (including the Member Guarantor) under their respective Acquisition
> Agreements.

(Hough Decl., Ex. A at 2.)  A "Released Guarantor" means any member or its parent

guarantor "whose Repayment Guaranty has terminated pursuant to Section 2(b) or 2(c)

thereof."  (Id.)  Under the Repayment Guaranty, Meritage agreed to pay "upon demand by

the Administrative Agent" following a Bankruptcy Event the principal, interest, fees, and

other payments "when such sums are due and payable, whether on demand, at stated

maturity, by acceleration or otherwise."  (Id.)  Meritage further agreed that its obligations

"shall not be reduced by amounts paid by any other guarantor," and that JPMorgan would

not have to pursue South Edge, any other guarantor, or the collateral under the loan before

Meritage was liable under the Repayment Guaranty.  (Id.)

The Repayment Guaranty thus unambiguously provides that Meritage agreed to

pay JPMorgan under the Repayment Guaranty upon JPMorgan's demand in June 2011, and

that is the relevant time for performing the calculation of the Guaranteed Share.  Meritage's

interpretation conflicts with the Repayment Guaranty's plain language that Meritage

promised to pay when the obligations came due, including upon demand.  It also conflicts

with the provision that Meritage's obligations once triggered would not be reduced by

amounts paid by any other guarantor.  Indeed, Meritage's position would undermine the very purpose of the Repayment Guaranty, which was triggered only upon South Edge's bankruptcy.  Meritage is incorrect that it owes only for its percentage of the deficiency if one exists following Plan confirmation for these same reasons.

As to the amount of damages, JPMorgan's Executive Director, William Austin ("Austin"), avers in a declaration that Meritage's Guaranteed Share under the Repayment Guaranty is 3.51%, which Austin calculated by dividing the value of Meritage's final Takedown price for the April 2008 takedown ($12,343,500) by the total value of the uncompleted Takedowns of all members ($351,760,500).  (Austin Decl. at 3.)  Austin further states that as of June 6, 2011, when JPMorgan made demand on Meritage, Meritage owed its share of outstanding principal, interest, fees, and other payments in the amount of $13,242,842.10, or 3.51% of the overall total of $377,288,948.81.  (Id.)  According to Austin, that number increased to $13,394,644.97 by August 22, 2011, due to interest accruing at a rate of $1,709.58 per day.  (Id.)

Although the Guaranteed Share, principal amount owed, and interest thereon may be a matter of calculation based on the Credit Agreement and the Repayment Guaranty, the liability under the Repayment Guaranty includes commitment fees and Letter of Credit fees, as well as payments under Approved Swap Agreements.  (Hough Decl., Ex. A at 2.) JPMorgan does not provide any information about these fees or how they impacted Austin's calculation.  The Court therefore will allow Meritage to conduct discovery on the amount of damages owed under the Repayment Guaranty.

### 6.  Conclusion

For the reasons stated above, the Court will grant in part and deny in part JPMorgan's Motion for Summary Judgment.  The Court will grant the Motion as to Meritage's liability on the Repayment Guaranty.  The Court will deny the Motion as to the amount of damages, and the parties may conduct discovery on the damages calculation.

**IV.  MERITAGE'S RULE 56(d) MOTION**

Meritage moves the Court to defer ruling on summary judgment until it has had

the opportunity to conduct discovery on a variety of topics.  JPMorgan responds that the

Court should deny Meritage's motion because Meritage's discovery relates to extrinsic

evidence which the Court cannot consider because the parties' agreements are

unambiguous.  JPMorgan also contends Meritage has had sufficient discovery in other

litigation amongst the parties, including South Edge's bankruptcy proceedings.

Under Federal Rule of Civil Procedure 56(d) if, in response to a summary

judgment motion, "a nonmovant shows by affidavit or declaration that, for specified

reasons, it cannot present facts essential to justify its opposition," the court may defer

consideration of the motion or deny it, allow the parties time to complete additional

discovery, or grant other appropriate relief.  The party requesting additional time to conduct

discovery to oppose summary judgment must present an affidavit stating the specific facts it

hopes to elicit from further discovery, that the facts exist, and that the facts are essential to

oppose summary judgment.  <u>Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg.</u>

<u>Corp.</u>, 525 F.3d 822, 827 (9th Cir. 2008).  If the nonmovant does not satisfy these

requirements, the court may proceed to rule on summary judgment without granting

additional discovery.  <u>Id.</u>

Meritage has provided an affidavit from its attorney detailing the areas of

discovery it wishes to pursue prior to the Court ruling on summary judgment.  Specifically,

Meritage seeks discovery on the following topic areas:

> (1) all correspondence, memoranda or other written documents
> concerning or relating to JPMorgan's negotiation of the bankruptcy
> plan with the Settling Builders; (2) the different versions of the
> bankruptcy plan negotiated/exchanged between JPMorgan and the
> Settling Builders; (3) all correspondence, memoranda or other written
> documents concerning or relating to the Settling Builders' formation of
> Inspirada Builders, LLC, the entity that will emerge from the
> bankruptcy; (4) the different versions of the Inspirada Builders, LLC's
> operating agreement; (5) all correspondence exchanged between

JPMorgan, and/or the Settling Builders relating to the bankruptcy plan or Inspirada Builders, LLC; (6) JPMorgan's failure to approve Meritage's April 2008 takedown, including all internal correspondence, memoranda or other written materials related thereto; (7) the Credit Agreement, including all internal correspondence, memoranda or other written materials related thereto regarding any discussions about the non-recourse nature of the loan as to the members; (8) the parties' intent when executing the Repayment Guaranty; (9) the parties' intent and circumstances surrounding the signing of the Forbearance Agreement; (10) the parties' reasonable expectations regarding the interrelationship of the different loan documents and guaranties; (11) why JPMorgan did not file an involuntary bankruptcy sooner, JPMorgan's intent in filing the involuntary bankruptcy proceeding and JPMorgan's polices/procedures when making that decision; (12) why JPMorgan initially agreed to move forward with the April 2008 takedown, its change in position, and the policies/procedure in place in deciding whether to move forward in such a circumstances; (13) why JPMorgan in October 2009 sent a letter to Meritage stating that it all along agreed to complete the April 2008 takedown; (14) the monies that Meritage placed in escrow to complete the April 2008 takedown and why JPMorgan did not take the money or direct it to be paid to a third-party if it believed that South Edge was in default; (15) JPMorgan's damage calculation/support; (16) the operative contracts, including the Repayment Guaranty, and all correspondence, memoranda or other written materials relating to the negotiation of the documents; and (17) the deficiency, if any, upon completion of the asset sale in conformance with the proposed bankruptcy plan.

(Defs.' Mot. for Relief Pursuant to Rule 56(d), Decl. of Douglas Northrup at 2-3.)

The Court will deny Meritage's Motion with respect to all categories except the damages calculation because Meritage has not met its burden of showing the facts exist and/or that the discovery on the other topics would alter the result on summary judgment. With respect to categories one through five, JPMorgan's negotiations with the Settling Builders, draft plans, or Inspirada Builders, LLC's internal operating procedures will not raise an issue of fact regarding the plain language of the parties' agreement as set forth in the actual Plan submitted to and confirmed by the bankruptcy court. Categories six through fourteen would not alter the fact that Meritage waived certain defenses, nor will it alter the plain language of the Repayment Guaranty, the Credit Agreement, or the Assignment Agreement. To the extent factual issues potentially could exist, some of the relevant

information is in Meritage's possession, such as whether JPMorgan ever made demand on Meritage or whether Meritage tendered payment to JPMorgan.  Additionally, Meritage already has conducted discovery on some of these very issues, particularly why JPMorgan declined the April 2008 takedown.  (Northrup Decl., Ex. 18 at 203, 208-17, 230.)  Meritage has not set forth what basis it has to believe discovery would reveal some other explanation for JPMorgan's conduct in relation to the April 2008 takedown than those reasons already revealed through prior deposition testimony.

The Court will grant Meritage's Motion with respect to the damages calculation. As discussed with respect to JPMorgan's Motion for Summary Judgment, some portions of the damages calculation are not fully explained or supported and are not capable of ready calculation from the face of the parties' agreements.

**V.  JPMORGAN'S MOTION FOR SUBSTITUTION**

JPMorgan moves to substitute in its place Development Specialists, Inc. ("DSI") as the Plaintiff in this action.  JPMorgan contends that it has designated DSI as its sub-Agent under the Credit Agreement and the Plan, and therefore DSI should be substituted as the Plaintiff in this action.  Meritage opposes, arguing there has been no transfer of interest to justify a substitution, and substitution would not expedite the case.[7]

Pursuant to Federal Rule of Civil Procedure 25(c), "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." Whether to allow substitution lies within the Court's discretion.  In re Bernal, 207 F.3d 595, 598 (9th Cir. 2000).

///

_____

[7]  Meritage also argues JPMorgan lacks standing in the case, and that defect in jurisdiction cannot be cured by substitution of DSI.  The Court already has rejected Meritage's arguments regarding JPMorgan's standing.

1        Although Meritage contends JPMorgan has not transferred an interest to DSI,

2  JPMorgan has appointed DSI as its sub-Agent under the Credit Agreement and transferred

3  to DSI the rights and duties associated with pursuing Meritage on the Repayment Guaranty.

4  The Repayment Guaranty provides that JPMorgan may collect on the Guaranty as

5  Administrative Agent for the benefit of the other lenders for the obligations owed under the

6  Credit Agreement.  (Hough Decl., Ex. A at 2.)  Under Section 10.05 of the Credit

7  Agreement, JPMorgan was permitted to perform its duties as Administrative Agent through

8  sub-agents.  (Seay Decl., Ex. 3 at 88.)  Meritage agreed to these provisions.  (Seay Decl.,

9  Ex. 3; Hough Decl., Ex. B.)   Consequently, under the parties' agreements, Meritage knew

10  and agreed that JPMorgan as Agent was the real party in interest who the other lenders

11  authorized to act on their behalf in pursuing Meritage on the Repayment Guaranty.

12  Meritage further knew and agreed JPMorgan could perform those duties through a sub-

13  Agent.  Under New York law, DSI therefore may pursue the action in its own name.  <u>See</u>

14  <u>Coll. Mgmt. Co., Inc. v. Belcher Oil Co. of N.Y.</u>, 552 N.Y.S.2d 616, 618 (N.Y.A.D. 1990);

15  <u>Watts v. Phillips-Jones Corp.</u>, 207 N.Y.S. 493, 498 (N.Y.A.D. 1925); <u>Cf.</u> <u>Chase Manhattan</u>

16  <u>Bank v. Motorola, Inc.</u>, 136 F. Supp. 2d 265, 270-71 (S.D.N.Y. 2001).

17        The substitution fulfills the Plan's provisions, which call for JPMorgan to appoint

18  a sub-Agent to pursue Meritage on the Repayment Guaranty.  Meritage identifies no

19  prejudice from the substitution, particularly where DSI is JPMorgan's agent and JPMorgan

20  will remain a party as Counter-Defendant on Meritage's counterclaims.  The Court, in its

21  discretion, therefore will grant JPMorgan's Motion to Substitute.

22  **VI. CONCLUSION**

23        IT IS THEREFORE ORDERED that Plaintiff JPMorgan Chase Bank, N.A.'s

24  Motion for Summary Judgment (Doc. #14) is hereby GRANTED in part and DENIED in

25  part.  The Motion is granted as to the liability of Defendants Meritage Homes Corporation

26  and Meritage Homes of Nevada, Inc. on the Repayment Guaranty.  The Motion is denied as

1   to the amount of damages.

2          IT IS FURTHER ORDERED that Meritage's Motion for Relief Pursuant to Rule

3   56(d) (Doc. #40) is hereby GRANTED in part and DENIED in part.  The Motion is granted

4   to the extent the Court will allow Meritage to conduct discovery on the damage calculation.

5   The Motion is denied in all other respects.

6          IT IS FURTHER ORDERED that Meritage's Motion for Leave to File Sur-Reply

7   or Alternatively to Strike (Doc. #51) is hereby GRANTED.

8          IT IS FURTHER ORDERED that JPMorgan's Motion for Substitution of Parties

9   Pursuant to Federal Rule of Civil Procedure 25(c) (Doc. #54) is hereby GRANTED.

10          IT IS FURTHER ORDERED that Development Specialists, Inc. is hereby

11   substituted for JPMorgan Chase Bank, N.A. as Plaintiff in this matter.  JPMorgan Chase

12   Bank, N.A. shall remain a party to this action as Counter-Defendant.

13

14   DATED:  September 4, 2012

15

16                         PHILIP M. PRO

                         United States District Judge